U.S. v. Ball, Gregory, Gillespie, Ruvalo, and Benzer Each side has 20 minutes. If you want to split up the argument, do it amongst yourselves. We won't do it for you. And if one goes over and takes the other's time, that's a tough deal. And you're going to have to have my associate's good heart to get you any time to talk. So that we know who's who here before we get started, what is the order in which you're going to present your case? Yes, I'm attorney Wendy Obermeyer for Leon Benzer, and I will be presenting first as to sentencing issues for both Benzer and Ball. That's Silver Lining, right? Silver Lining was his company. Who's next? Then Ruvalo. And you are? Ruvalo. Okay. Then who's next? You cede your time to? You cede your time to? These other people. Oh. Who's next? All right. And last but not least? Ball. Okay. Do you want no time or do you want some time? All right. And you're representing the government, right? Were you a trial attorney? All right. So it's Benzer, Ruvalo, Gillespie, the sister, Ball, and Gregory, the lawyer, presented in that area. Okay. All right. You're off. Good morning. May it please the Court. I'm Wendy Overmyer with the Federal Public Defender for Leon Benzer. Today I'll be addressing sentencing as to Benzer and David Ball, and I will reserve three minutes for rebuttal and I'll watch my time. I have a question, Ms. Benzer. As to the 188-month sentence, the judge said he was following, following the guidelines in the PSR, right? One of the recommendations of the PSR was that because the loss, an intended loss, was $50 million, actually it was $51 million. Fifty-eight. Fifty-eight million. Yeah. Fifty-eight, 148. Over 50 million. Correct. The calculation under the suggested guidelines started at level 24. If the suggested, if the loss were 7 million, it would start at 20. Correct. What is the difference in minimum guideline range between starting at 24 and starting at 20? The difference? The difference, if you start with 20, it's 121 to 151. And if you start at 24, it's 188 to 250? 235. 235. Correct. And remand is necessary because the district court did exactly what the guidelines said. Next question. Go ahead. Now, in the computation of the loss and intended loss, I understood, and correct me if I'm wrong, that the judge considered the total amount of defect settlements procured by the HOAs, homeowners associations, to be the loss or intended loss without any deduction for any of the work that Mr. Benzer's company, Silver Lining, did to remedy any of the defects. Right? Now. Correct. Stay with me for a second. What was the evidence adduced by Mr. Benzer as to the work done to reduce the amount of loss and intended loss if, as the jury found, or maybe as the judge found from the jury verdict, that he intended to swing with all of the intended settlements? Okay. Benzer pled guilty. He did not go to trial, so there were no findings by the judge. That's the difficulty. Yes. So, Benzer, as far as the intended loss, yes, the government is claiming that the entire settlement amounts of those HOAs, which occurred well after the fraud ended, that the entire settlement amount should be intended loss. And Benzer was arguing that only the actual loss to Vistana, the only HOA that was completed, should apply. Which is what he took less than what he did to remedy the defects. Yes. What was the evidence as to what he did to remedy the defects? It was, from what I understand from the record, it was agreed upon between Benzer and the probation department that those were worth, the performance that was done was worth about $2 million of the $7 million. $2 million? Yes. All right. So that's why the PSR with the actual loss went to the $12 million number instead of the $14 million number. Although both $7, $12, and $14, all of those numbers still fall within the $20 level enhancement. But the problem here, the central problem here, is that the court combined actual loss with intended loss. And the guidelines, you cannot do that under the guidelines. The guidelines must be the greater of actual or intended loss. And that's why we're asking for remand, because the district court did exactly what the guidelines instruct not to do. The court must follow the guidelines by correctly determining the greater of the two ranges, not just the loss amount, but the two ranges. So what you do when there's a partially completed fraud offense, you take the actual loss, here, just using the government's figures of $14 million, you would take the actual loss, calculate the range with that loss, with the other specific offense characteristics, and you come to a guideline range. And then you'll be able to. The actual loss is $14 million? It's still a $20 level enhancement. With $14 million, it would still be a $20 level enhancement. Where does it change? It's a $20 million threshold to get to the next level. So $14 million less the $2 million of work that was done? That's what the PSR had. So the PSR had $12 million. Now what the court didn't do is then do the intended losses, which the government was alleging was $45 million. Of course, we contest that number. But even using that number, you would have to calculate the guidelines using the $45 million number with the special offense characteristics and minusing 3 because it was an incomplete conspiracy. So you calculate those two ranges. The court didn't calculate those two ranges. And you take the greater of the two, which here turns out to be the actual. Your position is that the intended loss by the government was $45 million. That's what the government says. And do we deduct anything from that $45 million? Yes, Benzer would say that you do deduct. How much? Deduct from that. That's the problem. We don't really have the figures of what were the attorney's fees that were the full credit for legal work of the attorneys. What construction work would Benzer have performed? Would it have been the same percentage as they used in Vistana? Would it have been something else? The government didn't offer any of those numbers. It's asking for the whole settlement. It was my understanding that the PSR and the government calculated the intended losses were over $50 million. Now, they added the $45 million to the $12 million of actual loss, and that's the only way they get to the $58 million number. If you just take the $45 million number, that's a 22-level enhancement that you would apply. So the only way that the court could have gotten to a 24-level enhancement here is by combining actual and intended losses. If the steps, the millions of dollars that change the sentence, are at $20 and it's $50, if you take the higher of intended or actual loss, it's $45 million, and if that's below $50, what's the result as far as the level at which you start? When you do the intended loss calculation, it's a 22-level enhancement. Which is? And then you also take off three points under the conspiracy guideline because it was an incomplete conspiracy. And so that gets you to $108 to $135. So it actually ends up being less than the actual completed loss range, which, again, is $121 to $151, which is a five-year difference. Benzer received a 15-year sentence. And so that's at least a five-year difference from the low ends. Well, it's different than what he got, which was $188. And for the same reason, in Ball's case, Ball had a 10-level enhancement applied for a $141,000 loss that he objected to. And this was never resolved. He was sentenced, and then the court clarified what it did with the guideline after it had imposed sentence. And the government could not and still not come up with any victim in Ball's case that suffered this $141,000 mortgage loss. Well, I think the judge said he wanted to keep the sentences from being disparate. I believe that's a goal of sentencing, but you have to calculate the guidelines correctly first. That's the starting point. That's the bench point. And that's what was done incorrectly here. And so we ask for remand. Okay. That's your argument. Thank you. All right. I understood that. All right. I take it you're not going to argue the failure to mention litigation's evidence of the mental condition of Mr. Benzer. So you're leaving that? We'll leave that out. All right. Okay. You're Mr. Whipple. I am, Your Honor. For Mr. Ruvalo. Yes, Your Honor. Okay. Mr. Ruvalo is styled, rightly or wrongly, as one of the politicians, right? Yes, Your Honor. He was a board member. All right. Just for purposes of, we don't have a program here. We've got to tell the players about the numbers, right? Yes, that's correct. Your Honor, with the court's permission, I'd like to reserve two minutes for my rebuttal. All right. Are you going to discuss the comments of the district court? Is that what you're here to discuss? I am. All right. Yes. I just want to get the right part of my outline because I've got a big outline here. I understand. About all the issues. Your Honor, my time here is strictly spent on judicial misconduct. In my opinion, the court- Well, let me ask you, first of all, on judicial misconduct. I should have asked her, but I didn't. This is really a plain error of view, right? It is, Your Honor. So what does that mean to me? Well, Your Honor, I believe that there's enough error here that there's structural error. That my claimants and all the defendants in this case were precluded from getting a fair trial. We had a trial judge in this situation that was bullying, belittling defense attorneys and not allowing us to properly represent our clients. And I have to consider the trial as a whole, right? Yes, Your Honor. In the context of a 15-day jury trial, right? Yes, Your Honor. And now I have to decide, is there an abiding impression that the judge's remarks and questioning protected or projected to the jury an appearance of advocacy or partiality? That's correct. Couldn't I say that some of the district court's interpretations were reasonable attempts to minimize repetition and save time? Your Honor, there's no question that they can be classified in that manner. Unfortunately- Couldn't I say also that some of those were proper examples of the court limiting the scope of defense counsel's questioning toward the witnesses? Yes, Your Honor, absolutely. The problem is not the message that was the issue. It's the way it was delivered to defense attorneys, how we were belittled and bullied by this trial court to the point where we could not accurately or completely represent our clients. Now, why didn't you object? Well, Your Honor, hindsight's 20-20. And at the end of the day- The way it was repeated and blatant and flagrant, did you respond to it? And you had an opportunity to point out to the judge, Judge, this is really affecting the course of the trial or particularly in a lengthy trial to try to straighten matters out. Your Honor, you're absolutely right. But at the end of the day, the fact of the matter is he was bullying us. We were attempting to try to address the issues. We were concerned about representing our clients in the heat of the battle. You know, when you have this person that's in charge of the courtroom belittling you and pulling you around, it's hard to stand up after you've already been threatened a number of times. It's hard to stand up and say, Your Honor, ask for mistrial because you're bullying me. At the end of the day- I'm having a tough time understanding why that didn't happen because that seems to happen quite a bit of time. But how do I distinguish this gate from United States v. Scott? Your Honor, in this case, the error- Think about Scott. In Scott, the judge- many of the judge's comments were inconsistent with the standards of judicial decorum. The judge interrupted an admonished defense counsel over a hundred times during the course of a week-long trial. And we said, not a problem. Your Honor, because of this situation- Not a week long. We got a 15-day jury trial. We got to look for these comments in between all the things that happened there. So that makes it indistinguishable. The things that that judge said were not much different than the things said in this case. And yet, in Scott, we said, not a problem. Well, because in this case, it rolled over not only to the defense attorneys, but to their clients as well. In this particular case, Mr. Gruvelo, an 86-year-old man who needed a walker and a comfort dog in order to take the witness stand, was consistently interrupted by the court. Consistently, unilaterally interrupting him. And then, when I was trying to put together an example, turns to the jury and calls it a charade. The most powerful individual in the room turns to the jury and calls my attempt to put together a demonstrative description a charade. Well, let me ask you another question. Even if we get to that point, we have to look about prejudice. So, I have to say, is the government's evidence against Gruvelo strong? It seemed like it was. He acted as a straw purchaser of two condominiums. He received monthly payments from Benzer. He joined the Chateau Nouveau board and the Park Avenue board. And there were witnesses that testified that he regularly attended the pre-meetings with members of the scheme. And that he consistently voted just the way Benzer wanted him to vote. Your Honor, correct. And all of that's pretty strong evidence. And then the judge gives an instruction that says, you're not to read anything the judge may have said or done into making your decision. So, let me respond to that. My client was 86 years of age. His defense was, I voted my conscience. Yes, they were my friends. Yes, they were people I admired. Yes, I respected them. But, at the end of the day, it was my conscience that I voted. And then when the court continued to interrupt this 86-year-old man and called his testimony a charade, it totally undermined his credibility. How do you respond to a judge when you're trying to present testimony consistently without the prosecution even objecting, unilaterally objecting an 86-year-old man? I'm saying your advocacy is good, but stand back just a minute. You're on appeal now. Yes, Your Honor. We're not here trying to make this determination on our own. We're on appeal. And I had, as I said, United States v. Scott. And in United States v. Scott, we said an instruction can alleviate any appearance of impartiality the judge may have conveyed. And in your trial, the judge said, don't read into anything I may have said or done. Your Honor, what can I say? Those are facts that we have to deal with. But at the same time, you need to put them in context with what actually occurred in front of the jury. I mean, the law is coming from him. Obey what I say. And then he turns to the jury and calls my client defense a charade and questions his own credibility without the prosecution even objecting. It's part and parcel the same thing. It's listen to me. And all that happened without you saying one thing about it. That's not true, Your Honor. We were constantly arguing and addressing the issues. But I'm just saying, not one time did you say, judge, I object to this. Your Honor, we did. I'll object on it before. Send the jury out. Let me talk to you. This is ridiculous. Why don't I object? I'm objecting to what you're doing. And, in fact, something very similar to that occurred with Mr. I forget the gentleman's name. I asked that he be removed because at one point when I was going through the lies that this person had told and the judge got upset because I was using, in his opinion, I was repeating a different lie every time. It was too many lies to keep track of. And so when we sent the jury out, he left the witness on the stand and asked the witness to be removed, and he refused to do so. At the end of the day, there was a constant attempt to try to learn. That's a different objection than saying, judge, what you're doing is wrong, rather than saying, well, I want this witness removed simply because he won't answer my questions. At the end of the day, it was the judge who was giving orders and telling the jurors what to acknowledge and what to agree to or what the law was. And then when he had to turn around and evaluate our evidence and minimize it and belittle it and tell them that what we were presenting was a charade went too far. Okay. I understand your argument. There's two and a half minutes left. It's a couple o'clock. Is there anybody else going to argue for Gillespie or Ball or Bergery? Mr. Judge, I'll start with you. I think it's Gillespie. No, Your Honor. Excuse me. All right. Thank you very much. Good morning. May it please the Court. Francesco Valentini for the United States. I'd like to begin with my opponent, counsel for Mr. Ruvalo, who just left off with a judicial misconduct claim. To your question, Judge Smith, and to your question, Judge Roberino, yes, plain error applies in this case because there was no objection. In fact, there was not only was there no objection, there was no request for mistrial. There was no request. Plain error presupposes that there was no objection. Correct. So why don't you tell us what the standard of plain error is. You might want to recite a lot of those three elements or four elements. Correct. There must be an error. They agree about no objection because they're agreeing it's plain error. Correct. The error must be there must be an error of law, which is clear, and that it is incumbent upon the defendant to establish that his substantial rights were harmed. Meaning he has to establish prejudice. I think he's really going at the fourth prong, that it seriously affected the fairness, integrity, or public reputation of the proceedings. That's perhaps what counsel is attempting to do. First of all, we don't believe that. Our position is that virtually all of the interruptions in this case were legitimate and were calculated and were calculated to confine, count, clarify the evidence. How about the reference to the charade? Okay, so the reference to the charade, we have heard about it today. If you turn to the experts of record, the rule of experts of record on page 253, what the judge was talking about was not the testimony of Mr. Ruvalo. It was a wholly inappropriate way in which defense counsel was trying to create a demonstrative through Mr. Ruvalo, but it was entirely based on the testimony of previous witnesses. In that exchange, it's plain, in fact, I think defense counsel so states in that passage, that what he was trying to do was trying to recap some of the testimony that has been produced over the last two weeks. Well, that is not a proper use of direct examination, not of a defendant, not of any other witness. So the charade. It seems to me charade goes off the end of the spectrum. The use of the term charade? Yeah. I mean, there's a lot of ways to deal with what this judge had to deal with without going through the kind of things this judge said. Having been there, there are times when I felt exactly like the judge did. What the counsel was doing was a charade, but I never said it because it then affects the jury just like counsel suggested. It might in some cases, but. I mean, you can sustain or overrule objections without making those kind of derogatory comments which affect the jury. I mean, you're the only one in the room where everybody laughs when they tell a joke, when I tell a joke. I'm the only one in the room where you are the show. Everybody loves you. And now you're saying that kind of stuff. So as we recognize in our brief, there were passages, there were times in this long three-week trial with very aggressive positions taken by defense counsel in which some of the comments by the court were impatient. Some of them were sarcastic. Mr. Castini, if you're saying that the term charade was not applied to Ruvalo's testimony, tell me to what it was applied. To what defense counsel was attempting to do. There was a colloquy about what defense counsel was attempting to do while Mr. Ruvalo was on the stand. Defense counsel was attempting to create a demonstrative where through other evidence that had been. I'm having difficulty following your language. He was attempting to create a demonstrative. Demonstrative is an adjective. What's the noun? Demonstrative exhibit. He was trying to put together a table. A demonstrative exhibit. Correct. He was attempting to do. Was he writing on a blackboard or was he writing on a whiteboard? Was he doing a PowerPoint? Tell me what he was doing. The record reflects that I believe he asked for permission to use an easel. So I believe it would have been a whiteboard. A whiteboard. He was writing on a whiteboard. And what the judge was saying was that defense counsel's writing on the whiteboard is a charade? No. No. What the trial court was referring to was what defense counsel was attempting to write on the whiteboard. Which had nothing to do with Mr. Ruvalo's testimony. He had only to do with testimony that had been introduced by other witnesses. So what he was criticizing as an improper trial action was defense counsel's writing on a whiteboard during Mr. Ruvalo's testimony? No. To be clear, no. What the trial judge was criticizing was the use of Mr. Ruvalo to speak for evidence as to which Mr. Ruvalo had already testified, did not have any personal knowledge, and just read certain pieces. Had the government objected to that and the judge was reacting to that? Or was that a sous-sponte objection by the judge? Well, in the course of the colloquy, there certainly was an objection by the government where we took the position that that was a demonstrative exhibit that should have been put together, could have been put together during closing argument. It was not a propitiatory comment. A charade comment came after or before? I will have to look back at the transcript. It doesn't seem to me the charade comment had anything to do with the government's objection in reading the testimony. No, but it had. That was all on its own sous-sponte. It had nothing to do with the government making an objection to the same kind, if you will, of objection. It may have been if it was in the context of discussing what defense counsel was attempting to do. But under this court, in any event, the Supreme Court has made clear in the Lutenki case where it is not sufficient to establish a bias or partiality. What is not sufficient is expression of impatience, dissatisfaction, annoyance, and even anger that are within the bounds of what imperfect men and women, even after having been confirmed as federal judges, sometimes display. A judge's ordinary efforts at courtroom administration, even a stern and short-tempered judge's ordinary efforts at courtroom administration remain immune. And that is essentially what this court held in Scott as well. Can you point to anything on the record in which there was what may be deemed any provocation or baiting on the part of counsel that might have generated the judge's response? Well, I believe in many of these instances, what the judge was doing was responding to, for instance, in many instances, defense counsel was attempting to get witnesses to read from documents that had already been introduced into evidence. So different district judges have different positions on how much latitude they give counsel on this kind of issue. Early on in the case, the government, too, attempted to have some witnesses read from documents that had been introduced into evidence. And the judge was just as stern in calling to our attention that that would not be permissible in this trial. He said, I mean, the jury can read. Is there anyone on the jury who's illiterate who can't read? So that's an impatient comment, and we were on the receiving end of that. But we changed our presentation's posture, and we avoided that kind of retake. The judge noted that the district judge was not sympathetic to sidebar discussions. This will all occur in front of the jury. But that's one of the points I wanted to raise when he first started. There was no request for a sidebar in this case. It's one of the many things that, along with, again, moving forward, again, along with request for a sidebar, request for curative instruction, these are all things that defense counsel on this record does not appear to have ever have requested. Judge, may I never say that he would not entertain any sidebar discussions? I am not aware of this record of any instance in which the judge refused to have a sidebar. Though some judges may say, I will not entertain sidebars. I think that's an important point, whether or not there was an opportunity for a sidebar. It is possible. It would be a relevant question. On the record, the trial transcript does not reflect any indication that the judge would not entertain sidebars. The last point that I should make, however, is, as your honors have pointed out, especially in plain error review, prejudice is a very important requirement before any release could be granted. In this case, not only is the evidence overwhelming against both Ruvalo and Mr. Gregory, the only parties who raised this objection, we also have a clear instruction by the judge, precisely the type of instruction that in United States v. Scott, this court found so important. We also have another aspect, which was also present in Scott, and that this court also stressed in Scott, which is that there was nuance in the verdict. This is not a jury that was overwhelmed by any potential impatient statement by counsel, by the trial court. Mr. Valentini, you said that evidence was overwhelming against Ruvalo. My notes indicate that Ruvalo was a straw buyer on two condos, and he joined the board of the HOA board and voted as Benzer wanted every time, right? That's correct. What's the other evidence besides those two condos? Did he ever live in the condos? No. The whole point of the conspiracy was that Mr. Benzer would finance the purchasing of these condos by straw purchasers, but that Mr. Benzer would control these condos, and who would live in these condos. In some cases, they were rented out. In some cases, they were not. The overwhelming evidence was that. It was that he entered into these transactions. He misrepresented the absence of conflicts in statements that he submitted to the HOAs. Mr. Valentini, did he get money from Benzer the way Gillespie did as down payment and say that it wasn't borrowed? Yes. In fact, not only did he receive money for serving as a straw purchaser, because of his advanced age, he has a special deal with Benzer, so he will receive the money on a monthly basis for $150 a month as opposed to $5,000 a year on both condos. In addition to that, he also received money on an ad hoc basis as a politician, the terms that Your Honor used before as well. I thought some of the best evidence was that he regularly attended the pre-meetings. Correct. He attended the pre-meetings. He acted at Benzer's direction. Wilson, he confided to Wilson, who was Mr. Benzer's point person, and she recruited that he was acting at Mr. Benzer's direction, and he received ad hoc payments after he took the specific actions that were agreed upon precisely at the pre-meetings that Your Honor just noted. I would like also, unless Your Honor- I think really you need to address counsel's arguments she made about sentencing. Correct. She made some pretty strong arguments there I think you need to address. So- I know you're going to put a lot on this one, but you better change courses. So I did want to acknowledge this sentencing claims. Benzer appears to have argued on appeal primarily that there was a violation of Rule 32I and that the judge was required to make a factual finding. But Rule 32I, as this court made clear in United States v. Petrie, applies only to actual factual statements in the PSR. The only arguable factual statement to which there was objection, and we don't think- That's not what I understand to be Ms. Obermeier's argument. As I understood it to be, that Judge Wright erred as a matter of law in adding the actual injury to the intended injury, actual loss to the intended loss. And apparently he did that. So how do you rebut that claim of error? Correct. I'm sorry. I was referring to one of the arguments that had passed in the briefing. The one you got to get to is the one she made earlier. Okay, right. Okay, I understand. So we don't believe there was any error on the part of the district court. The guidelines say that- I'm going to be fair. I don't think you made any specific ruling about that. But let's get to the real issue. Is there an error? No, right. As I was just saying, there was no error. The guidelines are clear that the loss amount is to be the greater of actual or intended loss. In this case, what we have is a fraud, a complete fraud, under the definition of fraud in Tulana, in the United States versus Tulana, in which some of the loss is intended, and it was measured according to an intended loss computation that was worth $45 million. And in one instance, the scheme had come to full fruition, and so in that instance the court used the actual loss as a measure of the loss at that specific homeowner association. But there's no problem with it. But that loss will still be lesser. It's no greater than the intended loss at that homeowner association would have been. Essentially, what the district court- Mr. Valentini, let's see if we've got the numbers right. Correct me if I go wrong. The actual loss was $14 million, less two services to be a net of 12. The intended loss was 45. If you take the greater of the intended loss rather than the actual loss, you've got 45. How do you get above $50 million in order to get to level 24? Right. So because, like, the distinctions that we refer to as actual loss for Vistana can also be characterized. It's also the intended loss at that specific homeowner association was at least $12 million, if not more. $12 million is what the loss actually was. But based on the evidence, Mr. Penza intended to-the evidence credited by the district court- Your position is you take the actual loss and put a new label on it as being intended to be lost because it was actually lost, and then you add the intended loss to that, and they're both intended losses. No. What we're saying is that where we have, as in this case, well, that I think would be a reasonable position. But our position in this case is that because in this case the loss was segmented in some instances, the firm was completed in all cases. So, you know, the reference to the instance in which some of the loss is actually completed and some of them is not completed, does not apply, the loss was completed in all cases. And in this case, but it was also segmented into different-depending on the different homeowner association. And so for the homeowner associations where there was no actual loss because the fraud, though completed, did not yield the fruits that Mr. Penza had intended, that the- But you said the intended loss subsumes actual loss. That's another way of putting the-that's a more eloquent and concise way of putting it. That's why if the intended loss is $45 million, you can't get over $50. Because the $45 subsumes the $12 or the $14 or the whatever. No, no, I want to be clear. The $45 million does not subsume any of the settlement amount at the Vistana Homeowner Association. It's only the other six homeowner associations. The Vistana Homeowner Association, this is critical. The Vistana Homeowner Association is where the fraud actually came to full fruition. It's only accounted for as a matter of actual loss. There is no issue of double counting whatsoever going on here. The only question is, what is the measure? What is the proper measure of the loss at the various homeowner associations that were within the scope of this- So it's just the opposite of being subsumed. In other words, you look at what actually happened, and then you calculate the actual loss, and then you add to that, according to you, what the folks intended the scheme to produce. So you add the actual-so if you produce nothing, you would take the intended loss. If you produce $1, you would add the $1 to what they had intended to do. Is that what you're saying? No, under our methodology, there would be no overlap. With respect to the homeowner associations where the fraud came to full fruition, the loss is the actual loss. We could have gone higher. We could have put on evidence showing that in that Vistana, Benzer actually specifically intended a higher loss. We didn't. We rested on the actual loss. For the other homeowner associations where the fraud did not come to full fruition, all we have is the intended loss. I still can't get over the idea that your maximum intended loss was $45 million. No. As of before the fraud came to full fruition at Vistana, the maximum intended-as of the time the settlement amount was paid at Vistana, the total intended loss would have been $45 million for the other homeowner associations plus the full amount of the Vistana settlement, which was never part of the $45 million. Again, it's critical. The $45 million in the table on page 8 or page 9, I believe, of Mr. Benzer's brief makes it clear. The $45 million involves zero loss of Vistana, which is the one homeowner association where the fraud came to full fruition. We could have said let's just take what Benzer really wanted to do to cause in terms of losses, the full amount of the settlement amount at Vistana. We did not. We said- Ventana was a $14 million settlement, right? It was $19 million total. Nineteen. Yes. Now, work was done on Ventana. Right. The fraud was completed on Ventana. Okay. Right. So the fraud was no longer intended on Ventana. Right, but- Unless you're saying that we count the $19 million of the intended loss on Ventana, regardless what happened, plus the $45 million, so then you get to, what, $56 million? No, $66 million. You don't do that, do you? No, but it would have been a perfectly- All right. Thank you. I think you're pretty well out of time. Okay, if I may make one last point. The other defendants had a particular individualized loss calculation, so to the extent that the court finds any error in the computation of loss with respect to Mr. Benzer, that error would not apply to the other defendants. Mr. Ball, et cetera. Okay, got you. Thank you very much. You want to spend two minutes on rebuttal? Try this. You've got two minutes and 45 seconds. I think the court understands that what happened here is that they did add the actual loss of Ventana to the intended incomplete fraud as to the other HOAs. The government keeps saying that was completed. Even in the plea agreement, there was information that two of the HOAs are not even mentioned in the plea agreement. Mission Ridge and Mission Point were abandoned before the raids, as was Park Avenue, and as was Jasmine. Jasmine is in the plea agreement as being unsuccessful, so it's a little confusing how the government is now claiming those were completed offenses when it was even part of the plea agreement that those were incomplete offenses. But even so, get to the real point. The point is he's saying nobody did anything wrong here. We had one actual loss of Vestana. He says it different than I do. And we had all this $45 million in Chateau Nouveau and these other, and so we added them together, and that's over $50. Well, under the guidelines, that's improper. Why? You take the actual completed offense with its loss, and you do that guideline calculation, and then you take the intended offense, that intended loss. And they're separate transactions, though. Yes. I think what you're saying may be valid if you had one transaction and you lost $14 million and then you had intended to have $45, but the intended loss relates to projects that have nothing to do with the actual loss. They were separate projects that were never completed. Correct. Because what I understand the government's argument is that, yes, you're right. If it was just part of one total project, you've either got to go with actual or you've got to go with intended. You can't go with both. But in this project, there was another one, Vestana, which is a part of the intended, absolutely part, and the $45 million doesn't cover it. If you threw Vestana's intended loss in there, which they're saying is the actual, even though they think it ought to be more intended, that there would be over $50 million. And I, frankly, look at the guidelines and I'm saying, why is that wrong? Under 2X and 2B control here, and they both have footnotes that reference each other, when there's a partially completed fraud offense, this is one fraud scheme. It involves many homeowners associations. It is one conspiracy. Correct. And it tells you what to do when there's a conspiracy that has been partially completed. And when that's the case, as here, you take the completed and actual losses and you do that guideline range. And then you take the intended incomplete fraud guideline range and you compare the two and you apply the one that's greater. And that's note 4 of 2X and it's note 18 of 2B. They both refer to each other. And so remand is necessary for the district court to do those guideline calculations and loss determinations in this case. Well, we could say that it's necessary because we don't know what the government ever thought, or excuse me, the district court ever thought, because they didn't say how it had determined its loss. That's correct. That's our main argument is that the court did not resolve this loss dispute, and so it needs to go back to resolve the loss dispute in the first place. Was it resolved incorrectly or it didn't resolve it? It didn't resolve it. The only clue we have is that he said Benzer was sentenced within the guideline range, but he never said what that guideline range was. And he said he pretty much followed the PSR and the PSR. He adopted it. Yeah, he said he pretty much, yes, used the PSR. Well, and he used the bottom of the guideline range that was in the PSR. So that's what it appears to be what happened, but that's implying that from the record. And this court has said before that it must be explicit on the record, that we shouldn't have to guess as to what guideline range was applied or what loss amount was applied. Thank you. Thank you very much. The case of the United States of America v. Ball, Gregory Gillespie, rule of law in this preceding session.
judges: Bea, N.R. Smith, Robreno